IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JEFFREY WAYNE STEWART,

      Petitioner,

v.                                                  Case No. 2:15-cv-07650

RALH TERRY, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are the petitioner's Petition for a Writ of Habeas Corpus (ECF No. 2) and the respondent's Motion for Summary Judgment (ECF No. 31).

## RELEVANT PROCEDURAL HISTORY

The undersigned finds it unnecessary to repeat the entire procedural history of the petitioner's state and federal proceedings thus far. The undersigned incorporates by reference the procedural history in the undersigned's prior Proposed Findings and Recommendation ("PF&R") (ECF No. 18).

As relevant to the instant proceedings, the petitioner, Jeffrey Wayne Stewart (hereinafter "Stewart" or "the petitioner"), is presently incarcerated at the Mount Olive

Correctional Complex in Mount Olive, West Virginia, following his conviction on two counts of second-degree murder by a jury in the Circuit Court of Braxton County, West Virginia.[1]  (ECF No. 14, Ex. 1 at 1; Ex. 2).  On February 8, 2005, the petitioner was sentenced to serve two consecutive forty-year sentences for a total of eighty years in prison. (*Id.*, Ex. 1 at 2).

As ordered by the presiding District Judge, the parties agree that this matter is proceeding only on the following grounds for relief:

1.      The petitioner was denied due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. when the trial court refused to grant a mistrial after a State witness testified that he had asked the petitioner to take a polygraph test.

2.      The State Court denied the petitioner due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. when the Circuit Court denied the petitioner's Motion for Acquittal at the conclusion of the State's case-in-chief.

5.      The petitioner was denied a fair and impartial jury, a fair sentencing process, and the effective assistance of counsel as secured by the First, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the U.S.A. by trial counsel's acts of omission and commission.

(b)      Failure to request/retain a firearms/ballistics expert

(e)      Failure to call the petitioner's co-defendant Eric Foster as a witness at trial

(f)      Failure to object to the State's closing argument (which prohibited asserting any related claim on appeal)

(ECF Nos. 22-24).

---

[1]  The petitioner was indicted, along with two co-defendants, in the Circuit Court of Nicholas County.  The charges arose out of the shooting deaths of Michael Murphy and Travis Painter outside a mobile home on White Water Road in Nicholas County on December 30-31, 2003.  The Circuit Court granted the petitioner's motion for a change of venue, and the petitioner was ultimately tried in Braxton County, which is within the jurisdiction of the United States District Court for the Northern District of West Virginia.  However, because the charges arose in a county that is within the jurisdiction of the United States District Court for the Southern District of West Virginia, this court appears to be the court with proper jurisdiction and venue.

On January 12, 2018, the respondent filed a Motion for Summary Judgment concerning these exhausted claims (ECF No. 31) and a Memorandum of Law in support thereof (ECF No. 32).  On January 18, 2018, the undersigned entered an Order and Notice, pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), of his right and obligation to respond to the respondent's motion (ECF No. 33).  On February 22, 2018, the petitioner filed a Response in Opposition to the respondent's Motion for Summary Judgment (ECF No. 34).  On March 8, 2018, the petitioner filed a second copy of his Response to the Motion for Summary Judgment (ECF No. 36).  The respondent did not file a reply brief.

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially

indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## SUMMARY OF RELEVANT EVIDENCE

During Stewart's trial, which was severed from that of co-defendant Eric Foster,[2] the jury heard testimony from the various law enforcement officials who conducted the

---

[2] Eric Foster was convicted of two counts of second degree murder in the Circuit Court of Nicholas County on October 7, 2004, prior to Stewart's trial in Braxton County. However, his sentencing did not occur until after Stewart's trial; thus, Foster invoked his Fifth Amendment rights and did not testify at Stewart's trial. Foster was also sentenced to two consecutive terms of 40 years in prison. Co-defendant Matt Bush, who testified for the State at the petitioner's trial, plead guilty to two counts of voluntary manslaughter. (ECF No. 30, Ex. 16 at 126-27).

investigation and tested evidence, the state medical examiner, co-defendant Matt Bush, several other eye or ear witnesses, and several character witnesses. The undersigned will discuss the relevant testimony of the witnesses as necessary.

In the late hours of December 30, 2003, or just after midnight on December 31, 2003, Stewart and his co-defendants, Matt Bush ("Bush") and Eric Foster ("Foster"), drove up to Mike Murphy's ("Murphy") camper on White Water Road in Nicholas County, West Virginia, where a gun battle ensued, resulting in the deaths of Murphy and Travis Painter ("Painter"). The testimony varied concerning the reason the group went up to Murphy's camper.

There was some testimony that Foster had an altercation with Painter earlier in the day, and that they went up there to settle the matter. (ECF No. 30, Ex. 15 at 37; ECF No. 30, Ex. 16 at 103-04). Foster's girlfriend, Tina Hartley ("Hartley"), testified that Stewart had just arrived at Bush's house when the altercation between Foster and Painter (also known as "Pole") occurred. Hartley testified that "Pole" had put a gun to Foster's chest, but Foster slapped it out of his hand. When Hartley told Bush to get Foster off "Pole," Bush said, "No. He gets what he deserves." (ECF No. 30, Ex. 16 at 226). Foster then pushed Painter back to his truck, and Painter said "This is enough, this fighting, you know. It's time to settle this; this nonsense. Just come up on Mike's hill, and we'll talk this out. This is foolish; we've been friends for a long time." (*Id.* at 226-27).

Hartley further testified that, as soon as Painter left, Bush grabbed several guns out of the bedroom and gave one to Stewart and said, "Mike had one coming to him anyway because of what he'd done to Sam." (*Id.* at 227). Then, they all got in the truck. Foster, Bush and Stewart dropped Hartley and another girl at someone else's house and took off. (*Id.* at 228). Hartley reiterated that Bush told Stewart, "Remember when Mike

and Sam got into it, how bad Mike beat Sam.  He has one coming; he's had one coming for a while now."  (*Id.*)  Hartley further testified that, later that night, she overheard Bush call Brian Stewart and say, "Brian, don't ask no questions.  But if anything was said, me and Eric was with you tonight."  (*Id.* at 229).

The petitioner, on the other hand, testified that, after partying at Bush's house and running out of drugs, he believed they were going to Murphy's to trade guns for methamphetamine.  (ECF No. 30, Ex. 16 at 258).  Thus, the group allegedly had three guns in the pickup truck:  a 30.06 rifle; a .22 pistol; and a 16 gauge shotgun.  Bush testified that all of the firearms, which were taken from his house, were loaded.  (*Id.* at 104-105).

Foster was driving the pickup truck, with Bush sitting in the middle, and the petitioner was in the passenger seat.  (*Id.* at 110, 246).  As the truck came up the hill, Murphy and Painter came outside and shone a spotlight on the truck.  Then, according to both Stewart and Bush, Murphy approached the vehicle with a gun.  The petitioner testified that Murphy came to the driver's side of the car and placed an SKS rifle to Foster's head and said, "It's a good night to die."  (*Id.* at 248).  The petitioner further testified that Murphy continued to hold the gun to Foster's head and shoved him down in the driver's seat, as Foster and the petitioner told Murphy that they didn't want any problems.  (*Id.* at 249-250).

According to the petitioner, at that point, he picked up the 16 gauge shotgun, which was sitting next to him in the truck and told Murphy to put his gun down, but he refused and the petitioner saw his hand go toward the trigger.  (*Id.* at 250).  Thus, the petitioner fired his shotgun out the window, hitting Murphy.  (*Id.*)  The petitioner testified that he then saw Painter pull out a handgun and start firing it, so the petitioner turned and fired four or five shots through the windshield.  (*Id.* at 251).  He also stated that there were

additional flashes coming from the porch. (*Id.* at 255). The petitioner testified that he thought they were all going to die. (*Id.* at 251). The petitioner denied that he went up there for any revenge. (*Id.* at 260-61).

Bush testified that Murphy pulled a gun on Foster and was screaming. However, he could not recall if Murphy stated "It's a good day to die" before Foster laid across them with the shotgun and shot Murphy. (*Id.* at 112-113, 123). Bush further testified that Stewart continued to fire off shots, pumping the shotgun in between, while gunfire continued to come from outside the truck as well. (*Id.* at 115-116). During this time, Foster was able to back the truck up and they drove off the hill. The trio returned to Bush's house.

Jeremy Hanna ("Hanna") and his girlfriend, Kimberly Halstead ("Halstead"), were inside the camper when the gunfight occurred. Hanna testified that, when the truck came up the hill, Murphy asked Painter if "that was the truck" and when Painter said yes, Murphy grabbed the SKS rifle, put a clip in it, and chambered it. (ECF No. 30, Ex. 17 at 38). Painter grabbed the .9 millimeter and they went outside. Hanna testified that Murphy was in front and went toward the driver's side, while Painter stayed back behind Murphy and more to the front of the truck. (*Id.* at 39). He saw Murphy draw the SKS on the truck. (*Id.*) He could not hear anything that was said before the gunfire started, and he did not see who shot first. (*Id.* at 39-41). Hanna further testified that he grabbed a gun and fired some shots down the hill. (*Id.* at 41-42).

Halstead, who remained inside the camper during the incident, testified that, when the truck pulled up, Murphy put the spotlight on the porch and then he and Painter went out toward the passenger side of the truck with guns. (*Id.* at 70-71). When she heard the first shot, she got down on the floor and did not see anything after that. (*Id.* at 73). When

it quieted down, Hanna went outside and started shooting back down the hill at the truck. (*Id.* at 74).   After the truck turned around and left, Halstead went outside and found Murphy and Painter laying on the ground.   Painter was laying on his back and Murphy was face down between Painter's legs.  Both were dead.  (*Id.* at 74-75).  Hanna's testimony confirmed the position of the bodies.  (ECF No. 30, Ex. 17 at 43).

Halstead and Hanna went back up to the camper to search for a phone, but they could not find one that worked.  Thus, they got in a vehicle and drove down to Matt Bush's house because he was the closest person they knew with a phone.  (*Id.* at 44-45).[3]  When they arrived at Bush's house, no one answered the door, so they climbed in through a window.  At that point, they were met and held at gunpoint by Bush and Stewart.  (ECF No. 30, Ex. 16 at 76-81).  Halstead said they told Bush and Stewart what happened at the camper and they were not permitted to leave.  (*Id.*)

Subsequently, Bush and Stewart took Halstead and Hanna to Foster's house, where they continued to hold them at gunpoint.  Halstead believed that Stewart still had a gun.  (*Id.* at 84).  Ultimately, the foursome drove back to Bush's house, where Bush and Stewart made Hanna help them wrap the guns in a blanket.  Then Bush and Stewart went outside with the guns.  After that, Bush and Stewart let Halstead and Hanna leave and told them not to say anything.  (*Id.* at 84-85).

Law enforcement arrived at the camper around 1:00 a.m. on December 31, 2003, and they began to collect evidence.  At the time the bodies were located, Murphy's body was laying across Painter's legs with "his head pretty much splitting the legs of Painter." (ECF No. 30, Ex. 15 at 73).  A loaded SKS rifle was found in the roadway; however, there

---

[3]  Apparently, at that time, Halstead and Hanna did not know that Bush, Foster, and Stewart were the people who had been in the truck at Murphy's camper.

was no evidence that it had been fired.  A .9 millimeter handgun was found in Painter's hand.  (ECF No. 30, Ex. 15 at 63-65; ECF No. 30, Ex. 16 at 31-32).  The firearms used to kill Murphy and Painter were subsequently located at Bush's house.  The .22 caliber pistol, which had five shells still in the cylinder, was found in the house.  (ECF No. 30, Ex. 15 at 22-23).  The 16 gauge shotgun had been wrapped in a blanket and buried under the floor joists in a garage or outbuilding.  (*Id.* at 103).

Deputy Walter K. Shafer, the lead investigating officer, testified that, as they collected evidence around the bodies, they found a "rat-tail-like" ponytail or piece of hair near Murphy's body.  (ECF No. 30, Ex. 15 at 76-77).  Shafer further testified that, during the autopsy, he observed that half of Murphy's rat-tail was gone.  (*Id.* at 78).  After Murphy's clothing was collected from the Medical Examiner's Office, Shafer noticed what he believed to be a "shotgun blast hole," with a "cookie-cutter look" in the hood of Murphy's jacket.  (*Id.* at 93-94).  He confirmed the existence of the hole when he was reviewing photographs from the crime scene.  (*Id.* at 107-08).  Murphy's wife, Diane Murphy, confirmed that that he had a rat-tail and that there had been no hole in the hood of Murphy's jacket the last time she saw it.  (ECF No. 30, Ex. 16 at 66).

The State Medical Examiner, Dr. Zia Sabet, testified about the cause of death for each victim.  He found that Murphy died of a "single gunshot wound of chest."  (*Id.* at 141).  Dr. Sabet opined that the shot came from about seven or eight feet away.  (*Id.* at 145).  He further testified that Painter's cause of death was a "single small-caliber gunshot wound of the right face, as well as pellet spreads on the chest, abdomen and right side of the body.  (*Id.* at 150).  Thus, Dr. Sabet concluded that Painter's head wound caused "immediate death," and that the wounds to the chest, abdomen and right side of the body were caused by shotgun pellets which, while not immediately lethal, caused "penetration

to the lung, the right lung; the liver; and right kidney." (*Id.* at 154-155, 157). Thus, he found that the shotgun wounds were a "contributing factor" to Painter's homicide. (*Id.* at 159).

## ANALYSIS

### A.  Ground One – Polygraph evidence.

In Ground One of his section 2254 petition, the petitioner asserts that he was denied due process of law as secured by the Fifth and Fourteenth Amendments when the trial court refused to grant a mistrial after a State witness testified that he had asked the petitioner to take a polygraph test, which the petitioner refused.  (ECF No. 2 at 4). Specifically, during the State's rebuttal, Deputy Walter K. Shafer, the investigating officer, was cross-examined by defense counsel Stephen Callaghan, who asked him if every question that had been asked of the petitioner during his interview with police appeared in his written statement.  Deputy Shafer testified before the jury that "the only question that I think that's not here is that I asked Mr. Stewart if he would take a polygraph test, and he refused."  (ECF No. 30, Ex. 17 at 64).

Thereafter, out of the presence of the jury, Mr. Callaghan moved for a mistrial on the ground that the jury heard the investigating officer mention (1) that he had asked the Defendant to take a polygraph test, and (2) that the Defendant refused.  (*Id.* at 68).  The judge denied the defense motion for a mistrial, but gave the jury a limiting instruction, and struck the Deputy's testimony.  (ECF No. 30, Ex. 17 at 68-69, 75).

The petitioner's section 2254 petition asserts that, by denying his motion for a mistrial, the trial court failed to apply clearly established federal constitutional law, and that the SCAWV similarly failed when it upheld that decision on appeal.  The petitioner cites to *State v. Frazier*, 252 S.E.2d 39, 43-44 (1975), which found that polygraph

evidence is inadmissible at trial, but fails to cite to any federal authority in support of his claim.  (ECF No. 2 at 4).

The petitioner first raised this claim in the state courts through his direct appeal, asserting that the limiting instruction given by the trial court was insufficient to cure the error.  (ECF No. 30, Ex. 5 at 6).  The SCAWV issued a one-page refusal Order, which exhausted the petitioner's state court remedies, but provided no specific analysis of this claim.  (ECF No. 30, Ex. 6).  The claim was not addressed in the petitioner's state habeas corpus proceedings.  When a State court fails to address an issue, or fails to articulate a rationale behind its ruling, the federal courts "must independently review the record and the applicable law; however, the review is not a *de novo* review.  *See Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000).  Rather, it is a deferential review to determine if the State court's decision is legally and factually reasonable.  *Id.*  Because the SCAWV's decision on the petitioner's direct appeal does not set forth its rationale concerning this claim, the undersigned will review the merits of this ground for relief under this standard.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that Deputy Shafer only mentioned the refused polygraph in passing.  Thus, the respondent contends that the "criminal context of the polygraph statement was minimal" and that the curative instruction rendered any error harmless.  (ECF No. 32 at 5).  The respondent's brief recognizes that evidence that a criminal defendant has refused a polygraph examination is inadmissible at trial, but maintains that the trial court "usually may cure the error by striking the evidence and instructing the jury to disregard it." *United States v. Brevard*, 739 F.2d 180 (4th Cir. 1984) (citing *United States v. Holman*, 680 F.2d 1340, 1352 (11th Cir. 1983)); *United States v. Smith*, 565 F.2d 292, 295 (4th Cir. 1977).  (*Id.* at 5-6).

The respondent further asserts, "[t]he most important questions to consider whether a curative instruction or a mistrial is appropriate after a reference to a polygraph test are these: (1) whether an inference about the result of the test may be critical in assessing the witness's credibility, and (2) whether the witness's credibility is vital to the case." *Id.* (*Id.* at 6). The respondent contends that this alleged error does not rise to the level of a constitutional violation and did not deprive the petitioner of a fair trial or his right to due process.

The petitioner's Reply cites to the same authority discussed above, but further cites to a case from the Northern District of New York, *Wynters v. Poole*, 464 F. Supp.2d 167 (W.D.N.Y. 2006). In *Wynters*, the court held that the prosecutor's examination of an investigator, which included statements that the defendant had invoked his right to remain silent, that he had exercised his right to consult with counsel, and that the defendant had stopped the interview when he was asked to undergo a polygraph test, was improper and that trial counsel's failure to object thereto was ineffective. Accordingly, the *Wynters* court found that, given the crucial issue of the defendant's credibility in that case, the conduct of the prosecutor, and defense counsel's failure to address or object to it, impinged on the fundamental fairness of the defendant's trial and resulted in constitutional prejudice. The court granted Wynters' habeas corpus petition on that basis. *Id.* at 181-183. The petitioner herein asserts that a similar finding should be made with respect to the prejudicial impact of Deputy Shafer's statement about his refusal to take a polygraph.

The petitioner also contends that further factual development of this claim may be necessary because his appellate and habeas counsel failed to interview jurors to ascertain whether the evidence of the polygraph refusal was a factor in their verdict. Thus, the

petitioner appears to be raising, for the first time, an unexhausted claim of ineffective assistance of appellate counsel (who was also Mr. Callaghan).  In support of this claim, he attempts to rely on the Supreme Court's decisions in *Martinez v. Ryan*, 56 U.S. 1 (2012) and *Trevino v. Taylor*, 133 S. Ct. 1911 (2013).

In *Martinez,* the Supreme Court held that, although ineffective assistance of habeas counsel, in and of itself, is not a cognizable claim in federal habeas corpus, inadequate assistance of counsel at initial collateral review (habeas) proceedings *may* establish cause to overcome a prisoner's procedural default of a substantial claim of ineffective assistance of *trial* counsel, where ineffective assistance of counsel claims are addressed, by law or by practice, for the first time, on collateral review, rather than direct appeal.  In *Trevino*, the Court clarified that this principle also applies where a State's procedural framework, while technically allowing ineffective assistance of counsel claims to be raised on direct appeal, makes it highly unlikely that a defendant will have a meaningful opportunity to raise such a claim in the appeal.

The issue of whether the petitioner was denied a fair trial because of the mention of his refusal to take a polygraph was raised and exhausted in his direct appeal.  The petitioner simply seems to be asserting that his appellate counsel failed to properly support that claim with evidence in the direct appeal.  He further appears to be relying upon the *Martinez* line of cases to contend that, because his habeas counsel, D. Adrian Hoosier, II, failed to develop evidence of whether any jurors were unduly swayed by the polygraph testimony to find the petitioner guilty, he should be allowed to pursue such a claim now.

However, the petitioner's reliance on *Martinez* appears to be foreclosed by the Supreme Court's more recent decision in *Davila v. Davis*, 137 S. Ct. 2064, 2065 (2017),

which declined "to extend *Martinez* to allow a federal court to hear a . . . procedurally defaulted [] claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim." Therefore, any additional claim of ineffective assistance of counsel on this basis is procedurally defaulted and barred from further review by this court.

The petitioner further asserts that the state record is incomplete, and that an evidentiary hearing may be necessary to develop evidence surrounding the prejudicial effect of the polygraph refusal comment. However, an evidentiary hearing in a section 2254 proceeding is permitted only under very narrow circumstances which are not met here. 28 U.S.C. § 2254(e)(2) specifically provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that – (A) the claim relies on – (i) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The petitioner herein cannot meet either of the prongs of section (A). He is not relying on any new rule of constitutional law, and the factual predicate for his claim was discoverable through the exercise of due diligence at the time of his direct appeal, when he raised the claim in the state court. Therefore, the petitioner is not entitled to an evidentiary hearing to attempt to develop such evidence now. *See Williams v. Taylor*, 529 U.S. 420, 430 (2000); *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011).

Finally, as addressed in section B below, there was sufficient evidence supporting the petitioner's guilt. Thus, he cannot establish, by clear and convincing evidence, that but for the inadvertent mention of the polygraph refusal, no reasonable factfinder would have found him guilty of the underlying offenses.

The clearly established federal precedent demonstrates that, generally, a trial court may cure the error of mentioning a polygraph by striking the evidence and instructing the jury to disregard it. That occurred in this case. A jury is expected to follow the instructions of the court. Thus, at bottom, the polygraph refusal comment in this case appears to be harmless error and a mistrial was not required.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, nor were such decisions based on an unreasonable determination of the facts in light of the evidence presented. Consequently, there are no genuine issues of material fact and the respondent is entitled to judgment as a matter of law on Ground One of the petitioner's section 2254 petition.

**B.     Ground Two – Sufficiency of evidence.**

In Ground Two of his section 2254 petition, the petitioner asserts that he was unconstitutionally prejudiced by the trial court's denial of his motion for judgment of acquittal based upon insufficiency of evidence to convict him of two counts of second degree murder. (ECF No. 2 at 5-8). The petitioner's claim is grounded in his argument that, because the evidence demonstrates that Travis Painter was killed by a single gunshot wound to the head from a .22 caliber handgun, which was fired by one of the petitioner's

co-defendants, he cannot be found guilty of second degree murder for Painter's death.

(*Id.* at 6-7).  His petition states in pertinent part:

> 9.    The two fatalities were caused by the discharge of two different weapons.
>
> 10.   Before petitioner may be convicted of two separate and distinct homicides the State must prove that he fired the fatal shots from two different and distinct weapons, a shotgun and a .22 caliber revolver.
>
> 11.   If petitioner discharged only the shotgun one or more times, and he did not fire the .22 caliber revolver he can only be convicted of the homicide of Mike Murphy, but not both men.
>
> 12.   Petitioner testified he discharged his weapon, the 16 gauge shotgun, first.  (Tr. Transcript, p. 250)
>
> * * *
>
> 15.   Petitioner submits that the only fatal injury inflicted on Mr. Painter was caused by the .22 caliber revolver discharged by Eric Foster.
>
> 16.   Mr. Painter was presumably dead, due to a fatal injury to his brain, when he sustained "widespread pellet injuries on the right side of the head, torso, buttock, and upper and lower extremities."  (Autopsy Report, 03/18/04, p. 2).
>
> 17.   The first gunshot wound inflicted by Eric Foster would have instantly killed Travis Painter, and any subsequent injury by a firearm was not culpably lethal whether inflicted by petitioner or Matthew Bush.
>
> 18.   In his closing statement, James R. Milam, II, again states, "The shot from Jeffrey Stewart to Travis Painter, he had the intent to hit Travis Painter, although the .22 caused the death . . . . (12/10/17 Trial Transcript, p. 66).

(*Id.* at 6-7).  Thus, the petitioner is asserting that because the evidence demonstrates that

he did not fire the fatal shot that immediately killed Painter, there is insufficient evidence

to support his conviction of second degree murder with respect to Painter's death.

   The respondent's Memorandum of Law in support of his Motion for Summary

Judgment asserts that this claim was not colorably exhausted but, nonetheless, addresses

the merits of the claim in its brief.[4]  The court has determined that the claim has been exhausted and will analyze it under the clearly established precedent for determining the sufficiency of evidence as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which is addressed in the respondent's brief.

In *Jackson*, the Court held that the relevant inquiry is "whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt."  443 U.S. at 319.  As further noted in *Jackson*, this standard permits the factfinder to reasonably and fairly resolve conflicts of and weigh evidence, and to draw reasonable inferences from basic to ultimate facts.  *Id.*  The respondent's brief further states:

> When Petitioner[] moved for acquittal at the close of the State's case, the State responded that it had presented the testimony of an eyewitness who "saw the Petitioner fire several shots from the vehicle" at the scene of the crime. (ECF No. [30], Ex. 10 at 28).  The circuit court, "viewing the evidence in the light most favorable to the State, which one is required to do on a motion for judgment of acquittal or a directed verdict . . . [found] that the State . . . made a *prima facie* case . . . ."  (*Id.*)  When Petitioner moved the court for a second time at the close of all the evidence, the court found that "there's enough evidence in the record, considering the evidence in the light most favorable to the State, that the jury could find that there was premeditation in this case." (*Id.*)  On habeas review, the circuit court found that "the evidence presented at the trial of this matter, when viewed in the light most favorable to the prosecution, was sufficient to convince a reasonable person, beyond a doubt, that the Petitioner was not acting in self-defense" when he committed his criminal acts. (ECF No. [30], Ex. 10 at 29).  As such, the circuit court's legal standard of review comports with the United States Supreme Court's holding in *Jackson*.

---

[4] The respondent appears to be relying upon a statement in the Circuit Court's Final Order that states: "The West Virginia Supreme Court has previously concluded that a denial of motion for acquittal does not implicate constitutional rights in such a manner as to be reviewable in habeas corpus." (ECF No. 30, Ex. 10 at 26 n.30, citing *State ex rel. Farmer v. McBride*, 686 S.E.2d 609. 620 (2009) and *State ex rel. Edgell v. Painter*, 522 S.E.2d 636 (1999)).  Nevertheless, the SCAWV summarily refused the petitioner's claim which challenged the denial of the motion for judgment of acquittal based upon the sufficiency of the evidence, and the Circuit Court also addressed the sufficiency of the evidence to support the petitioner's convictions in its Final Order.  The undersigned liberally construes the petitioner's claim in Ground Two of his section 2254 petition to be raising a cognizable sufficiency of evidence claim that was colorably exhausted in his direct appeal; a finding that went unchallenged by the respondent in his prior Motion to Dismiss.

(ECF No. 32 at 7-8).  The respondent further asserts that the evidence presented at trial showed that both Murphy and Painter died, or would have ultimately died, from gunshots fired by the petitioner, and that the physical evidence demonstrated that the petitioner was "shooting at everybody and everything that night" and "was still firing shots at the victims even though the 'danger was over at that point.'"  (*Id.* at 8, citing ECF No. 30, Ex. 17 at 109, 111).  The respondent further asserts that the factual findings made by the state courts are entitled to deference under 28 U.S.C. § 2254(e)(1).  (*Id.*)

The petitioner's response brief reiterates that there is no proof beyond a reasonable doubt that he fired the fatal shot that killed Painter.  (ECF No. 36 at 12).  He further asserts that, because the injuries that were attributable to the firing of his gun were not fatal, he "can be guilty of no offense greater than malicious wounding."  (*Id.* at 14).  Thus, he contends that his conviction for the second degree murder of Painter should be vacated.

However, the petitioner overlooks the fact that the State proceeded on a theory that the petitioner and his co-defendants were acting in concert at the time of the crimes, which did not require the petitioner to be the person who fatally shot Painter in order to be culpable for his death.  In fact, the jury was instructed as follows on that issue:

> Under the concerted action principle, the defendant who is present at the scene of the crime and, by acting with another, contributes to the criminal act is criminally liable for such offense as if he were the sole person committing the crime.

> However, it is not necessary that Jeffrey Wayne Stewart do any particular act constituting any element of the crime of murder in order to be found guilty under the concerted-action principle so long as he is present at the scene of the crime and the evidence is sufficient to prove, beyond a reasonable doubt, that he shared criminal intent and acted together with Matthew Wayne Bush or Eric Allan Foster, or anyone who did the acts necessary to constitute the crime, pursuant to a common plan or purpose to commit the crime.

(ECF No. 30, Ex. 17 at 94-95).

The petitioner admitted that he was present at the scene of these crimes, and further admitted that he fired a shot from a 16 gauge shotgun at Mike Murphy, and fired additional shots through the windshield at Travis Painter.  The evidence demonstrates that Painter was wounded by those shots.  Dr. Sabet testified that, although the shot to Painter's head from a .22 caliber handgun was "immediately fatal," the wounds inflicted by the 16 gauge shotgun also would have proven fatal without treatment.  (ECF No. 30, Ex. 16 at 154-155, 159).

Such evidence demonstrates that the petitioner was present at the scene and acted in concert with his co-defendant who fired the fatal headshot.  Although the petitioner testified that he did not go up to the camper to get revenge and believed that he was going there to trade guns for drugs, other testimony suggested that the trio went up to Murphy's property to settle matters after the altercation earlier in the day.  During the omnibus evidentiary hearing, the petitioner testified that he did not have any communications with Bush or Foster prior to this incident about issues with the two victims.  (ECF No. 30, Ex. 18 at 29).  He further testified that he did not even know if Murphy or Painter actually lived at that residence.  (*Id.* at 31).

However, based upon all of the evidence presented taken in the light most favorable to the State, a reasonable trier of fact could find that the petitioner, acting in concert with his co-defendants, unlawfully, intentionally, and maliciously killed Travis Painter, but without premeditation or deliberation.  Thus, as found by the state courts, the evidence was sufficient to find the petitioner guilty of second degree murder with respect to victim Painter.  (*See* ECF No. 30, Ex. 10 at 28).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions were neither contrary to, nor an unreasonable application

of, clearly-established federal law, nor were such decisions based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Consequently, there are no genuine issues of material fact and the respondent is entitled to judgment as a matter of law on Ground Two of the petitioner's section 2254 petition.

### C.    Ground Five – Ineffective assistance of counsel.

In Ground Five of his section 2254 petition, the petitioner asserts three claims of ineffective assistance of trial counsel. In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-91. Moreover, "judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the petitioner to show prejudice. *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983). Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance

of trial counsel.  *See Strickland*, 466 U.S. at 693.  Using this standard, the undersigned will address each of Petitioner's claims of ineffective assistance of counsel.

### 1.    Ground 5(b) -Failure to call expert witness.

In Ground 5(b) of his section 2254 petition, the petitioner contends that his trial counsel, Mr. Callaghan, failed to call a firearms/ballistics expert to support his theory of self-defense.  With respect to this claim, the section 2254 petition states in pertinent part:

> Mr. Callaghan did not request a firearm expert to determine which firearm fatally wounded Mr. Murphy or evaluate any ballistic evidence as to the trajectory of that fatal shot.  Evidentiary Hearing, 05-15-13, p. 71.

(ECF No. 2 at 18).  The petitioner admits that there "was a plausible link between the weapon carried by petitioner and the immediate cause of Mr. Murphy's death, i.e., a single shotgun would [sic; wound] of the chest."  (*Id.* at 19).  The petitioner denies any such substantial link between himself and the fatal wound to the head of Mr. Painter.  (*Id.*) Accordingly, he appears to be asserting that the testimony of a defense ballistic expert could have altered the outcome of his trial.  However, he provides no summary of what outcome determinative facts and opinion such expert would have offered.

The petitioner admits that he fired the shot that killed Murphy.  However, there was a dispute concerning how far away Murphy was when the shot was fired.  The petitioner and Bush testified that Murphy was positioned just outside the driver's door, with a gun to Foster's head.  The medical examiner, on the other hand, opined that the shot was fired from seven or eight feet away.  Murphy's body was ultimately located on top of Painter's.

With respect to this claim, the respondent's Memorandum of Law in support of his Motion for Summary Judgment focused on Mr. Callaghan's testimony at the omnibus evidentiary hearing.  The Memorandum states:

Trial counsel acknowledged that Petitioner's strategy at trial was self-defense; not whether he actually committed the act. (*See* ECF No. [30], Ex. 18 at 77) ("My strategy was self-defense, and whether [the victim] was standing right at the truck window or five feet away from it, it really didn't matter much as far as self-defense goes as far as I was concerned in my – in my strategy."). Counsel further noted that he discussed the strategy with Petitioner "several times" and met with him "many times" prior to trial. (*Id.*) Petitioner requested that a separate jury instruction regarding self-defense be read to the jury. (*See* ECF No. [30], Ex. 10 at 25-26). During closing arguments, trial counsel argued that "[the victim] was a violent person." (ECF No. [30], Ex. 17 at 125).

Because Petitioner's trial strategy was one of self-defense, his allegation that counsel rendered constitutionally deficient assistance in failing to call a firearm/ballistics expert at trial fails both prongs of the *Strickland* standard. First, counsel's strategy was not objectively unreasonable. It resulted in Petitioner being charged with two lesser-included counts of second degree murder and exonerated of all other charges. Second, Petitioner has submitted no proof that he was prejudiced by counsel's arguable failure to call an expert firearms/ballistics expert. This Court should thus deny Ground 5(b) of the 2254 Petition.

(ECF No. 32 at 10-11).

Without any explanation of what specific testimony a defense ballistics expert would have offered and how such testimony would have altered the outcome of his trial, Petitioner's response brief simply retorts:

Specifically, petitioner's right to effective assistance of counsel was denied when Stephen Callaghan, Defense Counsel, failed to hire or call a ballistic or firearm expert at trial given the evidentiary dispute of the distance between the petitioner, as the purported shooter, and Mr. Murphy. Mr. Callaghan did not request a firearm expert to determine which firearm fatally wounded Mr. Murphy or evaluate any ballistic evidence as to the trajectory of that fatal shot. Evidentiary Hearing, 05-16-13 [ECF No. 30, Ex. 18 at] p. 71.

(ECF No. 36 at 16).

The Circuit Court's "Final Order Denying Writ of Habeas Corpus and Dismissing Case" ("Final Order") found as follows:

Having carefully reviewed each of the Petitioner's claims of ineffective assistance of counsel and the evidence presented during the evidentiary

hearings, the Court concludes that the Petitioner failed to prove that Mr. Callaghan's assistance was deficient or ineffective under the standard in [*State v. Miller*, 459 S.E.2d 114 (1995)].[5]  At the hearing on May 16, 2013, the testimony elicited from both Petitioner and Mr. Callaghan indicated that Mr. Callaghan was successful in obtaining a change of venue (May 16 Transcript, p. 80); preventing numerous other charges against the Petitioner from being presented at trial (May 16 Transcript, p. 77); and reducing the charges of two (2) counts of First Degree Murder to two (2) counts of Second Degree Murder (May 16 Transcript, pp. 56-57, 77). Additionally, the majority of the Petitioner's claims relate to Mr. Callaghan's trial strategy, and this Court finds that "a reasonable lawyer would have acted, under the circumstances, as [Mr. Callaghan] acted in the case at issue."  Syl. Pt. 6, *Miller*, 194 W. Va. 3, 459 S.E.2d 114.  Mr. Callaghan testified that he thoroughly discussed all trial strategies with the Petitioner (May 16 Transcript, p. 76), and the Petitioner testified he had no disagreements with Mr. Callaghan during the trial (May 16 Transcript, p. 52).

(ECF No. 30, Ex. 10 at 10-11).  The Circuit Court further found that, even if the petitioner could demonstrate some error by Mr. Callaghan, he did not demonstrate that he suffered any prejudice resulting from such conduct.  (*Id.* at 11).

The Circuit Court's Final Order does not specifically discuss the petitioner's claim that Mr. Callaghan failed to call a ballistics expert.  Nonetheless, such a decision was a matter of trial strategy, and the court found that the petitioner has not demonstrated that any of the decisions made by Mr. Callaghan were constitutionally prejudicial.  Specifically, the Circuit Court held that, "even if, *arguendo*, there were errors or mere unsuccessful strategic decisions made by the Petitioner's counsel, such errors were harmless and did not cause any prejudice to the Petitioner, as there was no reasonable probability that the proceeding would have ended differently, if not for such errors or tactical decisions."  (*Id.* at 12).  The petitioner again raised this claim in his habeas appeal and the SCAWV affirmed the Circuit Court's decision, finding "[o]ur review of the record supports the

---

[5]  *Miller* is the seminal case in West Virginia on ineffective assistance of counsel, which cites to and relies on the *Strickland* standard.  Thus, it is the clearly established law applicable to all of the petitioner's ineffective assistance of counsel claims.

circuit court's decision to deny petitioner post-conviction habeas corpus relief based upon the errors he assigns on appeal, which were argued below." (ECF No. 30, Ex. 12 at 2).

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that Mr. Callaghan's conduct in failing to call a firearms/ballistics expert fell below an objective standard of reasonableness, or that he suffered any prejudice therefrom, and that the state courts' decisions were neither contrary to, nor an unreasonable application of the *Strickland* standard.

### 2. *Ground 5(e) - Failure to call witness at trial.*

In Ground 5(e) of his section 2254 petition, the petitioner contends that Mr. Callaghan provided ineffective assistance of counsel because he failed to call Eric A. Foster, the petitioner's co-defendant, as a defense witness at trial. The section 2254 petition notes that Foster was tried prior to the petitioner and was also found guilty of two counts of second degree murder. (ECF No. 2 at 17). However, the petitioner further notes that Foster invoked his Fifth Amendment rights and did not testify at the petitioner's trial. (*Id.* at 18). Nonetheless, the petitioner contends that there was sufficient evidence to suggest that Foster was the perpetrator of at least one of the homicides, yet Mr. Callaghan failed to call him as a defense witness. (*Id.*) Ground Five of the petition does not address what specific testimony Foster could have offered that was not cumulative of other evidence presented and would have affected the outcome of the trial.

The respondent's Memorandum of Law asserts that the petitioner has not demonstrated that Foster's testimony was objectively necessary to his defense at trial and that such testimony would have resulted in the petitioner's acquittal or conviction of some other lesser included offense. (ECF No. 32 at 11). The Memorandum further states:

> Trial counsel testified that he called as a witness at trial everyone he thought was beneficial to Petitioner's defense.  (*See* ECF No. [30], Ex. 18 at 72) ("Anybody I thought would help the case, we had them there.")  When discussing Petitioner's claim that Mr. Foster's absence from trial violated Petitioner's right of confrontation, the circuit court found that the sole reference to a statement Mr. Foster made merely placed Petitioner at the scene of the crime.  (*See* ECF No. [30], Ex. 10 at 21 n.21).  As further recognized by the circuit court, Petitioner's own trial testimony informed the jury that Petitioner was at the scene when the shootings occurred.  (*See* ECF No. [30], Ex. 10 at 24; *see also* ECF No. [30], Ex. 16 at 247-52).  As stated above, Petitioner's trial strategy was not whether he perpetrated the crime, as suggested by his 2254 Petition (*see* ECF No. 2 at 18-19), but one of self-defense.

(*Id.*).  As further aptly noted by the respondent, the petitioner has not addressed how Mr. Callaghan could have effectively questioned Foster (who had been convicted of two counts of second degree murder but had not yet been sentenced) if he invoked his Fifth Amendment right to remain silent.  The respondent's brief further states:

> In his 2254 Petition, Petitioner argues that Mr. Foster could have testified that he shot one of the victims (ECF No. 2 at 18, ¶ 10), but noted that Mr. Foster invoked his 5th Amendment [r]ights" (ECF No. 2 at 18 ¶ 9).  To suggest that trial counsel could have somehow usurped Mr. Foster's constitutional rights defies logic.  Because Petitioner cannot show that trial counsel's alleged failure to call Mr. Foster as a witness was possible, because he cannot show that trial counsel's actions were unreasonable, and because Petitioner cannot affirmatively prove that he was unconstitutionally prejudiced as a result, this Court should deny Ground 5([e]) of the 2254 Petition.

(*Id.* at 11-12).  The petitioner's response does not address this claim beyond reiterating that Mr. Callaghan failed to call Foster as a defense witness.  (ECF No. 36 at 16).

While the Circuit Court's Final Order did not specifically address the failure to call Foster as a defense witness, again, that was a matter of trial strategy.  Mr. Callaghan knew that Foster would invoke his Fifth Amendment rights and that the testimony he could offer would have been largely cumulative of the petitioner's and Bush's.  The petitioner has not presented any testimony or evidence that Foster could have offered that would

have affected the outcome of his trial. Accordingly, even if he could show that Mr. Callaghan's failure to pursue Foster's testimony fell below an objective standard of reasonableness, which he has not done, he also cannot demonstrate the requisite prejudice under *Strickland* to obtain habeas corpus relief on this basis.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that Mr. Callaghan's conduct in failing to call Eric A. Foster as a defense witness fell below an objective standard of reasonableness, or that he suffered any prejudice therefrom. Thus, the state courts' decisions denying habeas corpus relief were neither contrary to, nor an unreasonable application of, the *Strickland* standard.

### 3.    *Ground 5(f) - Failure to object to closing argument.*

In Ground 5(f) of his section 2254 petition, the petitioner contends that Mr. Callaghan provided ineffective assistance of counsel when he failed to object to statements made by the prosecuting attorney during closing argument. Specifically, the petition asserts:

> Defense counsel failed to timely object to an improper argument during closing arguments when Mr. Milam, prosecuting attorney, asserted defendant had an intent to kill Mr. Murphy because he fired a second shot at Mr. Murphy, an assertion not fairly supported by the testimony of any witness and foregoing appellate review of his conduct.

(ECF No. 2 at 18).

> The respondent's Memorandum of Law addresses this claim as follows:

> Trial counsel stated that there were no objections that he felt he failed to make. (*See* ECF No. [30], Ex. 18 at 78). The circuit court noted that the prosecutor's closing argument consisted of "the Prosecutor's own opinion of the evidence." (ECF No. [30], Ex. 10 at 19). Moreover, the circuit court, citing Syl. Pt. 5, *State v. Sparks*, 171 W. Va. 320, 298 S.E.2d 857 (1982), found that Petitioner had failed to prove that the prosecutor's remarks, which were arguments that "(a) [Petitioner's] actions were not in self-

> defense, and (b) that Petitioner had an intent to kill because [he] fired a
> second shot [at the victim] shooting a hole in his jacket and shooting off a
> lock of his hair[,]" were clearly prejudicial or resulted in manifest injustice.
> (*Id.*)    Rather, the circuit court continued, "the comments were simply
> legitimate inferences drawn from the evidence." (*Id.*)

(ECF No. 32 at 12).  Thus, the respondent contends that there was no objectionable error

in the prosecutor's closing argument and, thus, Mr. Callaghan cannot be found to have

rendered objectively unreasonable assistance because he failed to object to such

argument.  (*Id.*)  Therefore, the respondent asserts that the petitioner cannot satisfy the

first prong of *Strickland* and that Ground 5(f) of his section 2254 petition should be

denied.  (*Id.*)

The Circuit Court's Final Order specifically addressed this claim as follows:

> The Petitioner also contended that the Prosecutor made improper
> comments during closing statements.  Specifically, the Petitioner alleged
> that the Prosecutor improperly stated (a) that the actions were not in self-
> defense, and (b) that Petitioner had an intent to kill because Petitioner fired
> a second shot at Mike Murphy, shooting a hole in his jacket and shooting off
> a lock of his hair.   The Petitioner argued that these statements were
> improper because the State did not have the jacket tested t0 determine if
> the bullet hole came from Petitioner's gun and did not have the lock of hair
> tested to determine if it was Mike Murphy's hair.  Again, Petitioner alleged
> that the Prosecutor improperly made comments that were the Prosecutor's
> own opinion of the evidence.
>
> The analysis of the prosecution's remarks in the closing statements
> is almost identical to the consideration of the comments made during
> opening statements.  Even if the Prosecutor's comments were improper, the
> Petitioner failed to put forth evidence to show that they were clearly
> prejudicial or resulted in manifest injustice.  *See* Syl. Pt. 5, [*State v. Sparks*,
> 298 S.E.2d 857 (1982)].  No evidence was introduced to show that the
> comments misled or improperly influenced the jury's ability to weigh the
> evidence or that the remarks were deliberately placed before the jury to
> divert the jury's attention to extraneous matters.  *See* Syl. Pt. 8, *State v.
> Kitchen*, 226 W. Va. 278, 700 S.E.2d 489 (2010).  To the contrary, the
> comments were simply legitimate inferences drawn from the evidence.
> Moreover, absent the remarks, ample, competent proof was introduced at
> the trial of this case to establish the guilt of the Petitioner.  [Footnote
> omitted].  *Id.*

(ECF No. 30, Ex. 10 at 18-19).  In addressing the ineffective assistance of counsel claim based upon the failure to object to the closing argument, the Circuit Court further held that "the Petitioner's claims that Mr. Callaghan failed to object to certain prosecutorial misconduct, hearsay and allegedly false evidence are unfounded; because . . . any such conduct or evidence was not objectionable.  A review of the trial transcript shows that Mr. Callaghan made appropriate objections throughout the proceedings, and any decision not to raise an objection was a permissible, strategic determination by Mr. Callaghan."  (*Id.* at 11).

The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether prosecutor's conduct affected fairness of the trial."  *United States v. Young*, 470 U.S. 1, 11 (1985).  "Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation."  *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (citations omitted), *abrogated on other grounds, Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

In the instant case, there was evidence to suggest that a second shotgun shot went through the hood of Murphy's jacket and took off part of his rat-tail.  Thus, the prosecutor's argument that this evidence demonstrated that the petitioner possessed an intent to kill Murphy was a legitimate inference that could be drawn from that evidence.

Therefore, the prosecutor's argument was not improper and Mr. Callaghan was not ineffective in failing to object thereto.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that Mr. Callaghan's conduct in failing to object to the prosecutor's closing argument fell below an objective standard of reasonableness, or that he suffered any prejudice therefrom. Accordingly, the state court decisions denying habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, the clearly established *Strickland* standard.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and the respondent is entitled to judgment as a matter of law on the petitioner's claims of ineffective assistance of counsel pending in Ground Five of his section 2254 petition.

## **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 31), **DENY** the petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 2), and dismiss this civil action from the docket of this court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the

portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Petitioner, and to transmit it to counsel of record.

 July 31, 2018

Dwane L. Tinsley
United States Magistrate Judge